FILED

99 DEC -7 AM 9: 56
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
DEC 7 1999

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
Southern Division

HARRY LAMAR MCCOY, )
)
Plaintiff, )
)
v. ) CV-98-P-2203-S
)
SRA MILL SERVICES, INC. and )
BIRMINGHAM STEEL CORP., )
)
Defendants. )

## Opinion

Before the Court is a Motion for Summary Judgment[1] filed by Defendant Birmingham Steel Corporation ("Birmingham Steel") on August 20, 1999. The matter was heard with oral argument at the October 29, 1999 motion docket. For the reasons expressed below, Defendant's motion is due to be granted.

### I. Facts

Birmingham Steel is a mini-mill facility that produces steel reinforcing bar for the construction industry through the collection and melting of scrap metal. During 1998, SRA Mills, a steel mill services business, operated under a contract with Birmingham Steel to use their cranes to load large charge buckets with scrap metal as part of this melting process. These buckets were loaded in accordance with a scrap mix or recipe created by Ken Hicks, Birmingham Steel's Scrapyard Supervisor.

In order to have the correct chemical balance of scrap metal to make the desired quality of steel, the scrap mix or recipe must be followed by the crane operators who are loading charge buckets. Normally, three charge buckets of scrap metal are dumped into the furnace before the metal is melted down. Generally, there are two crane operators that build the three charge buckets. The

---

[1] In a motion dated October 28, 1999, Birmingham Steel moved to strike certain portions of plaintiff's evidentiary submission in opposition to its summary judgment motion. Because the challenged evidence has no bearing on the Court's decision regarding the summary judgment motion in this case, the motion will be deemed moot. Plaintiff's October 29, 1999 Motion to Strike Defendant Birmingham Steel Corporation's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment is denied.

1



first charge crane operator builds the first and second buckets, and the third charge operator builds the third. In accordance with the recipe, the first and second buckets contain a large variety of different scrap metal including metals high in carbon. Additional buckets generally contain mainly filler-weight metals. After each bucket is filled, it is transported to the melt shop, where the scrap is dumped into the furnace and is thereafter monitored for high carbon levels to determine if the amount of heat in the furnace is excessive and to ensure the desired quality of steel. Once the scrap metal is melted, it is poured into a ladle, taken to the caster, and poured into molds.

In 1992, Plaintiff Lamar McCoy was hired by Martin Metals as a locomotive operator. Around 1997, Martin Metals was purchased by SRA, and plaintiff continued working as a locomotive operator for SRA. Subsequently, Chris Welch, an SRA supervisor, offered Plaintiff a position as a crane operator. Plaintiff accepted the position and was trained by a fellow SRA employee. Dominick Quigley then became Plaintiff's supervisor at SRA.

In November and December of 1997 and February of 1998, SRA had problems with plaintiff not following the scrap mix or recipe. Failure to follow the recipe can result in high levels of carbon being present in the furnace during melting, causing the process to have to be stopped while oxygen is blown into the furnace in order to decrease the levels of carbon. Plaintiff had been warned by Dominick Quigley at least twice regarding his failure to follow the recipe, and Birmingham Steel melters made several complaints to John Van Giessen, Birmingham Steel's Melt Shop Superintendent, about the high carbon caused by Plaintiff's performance as the first charge crane operator. Plaintiff's problem with the scrap mix was documented in a December 11, 1997 Birmingham Steel Melt Shop memo which refers to Plaintiff's problem and states that Dominick Quigley and Jim Horsburgh, SRA President of Operations, were going to meet with the Plaintiff about his problem.

On March 30, 1998, a furnace of steel referred to as "heat 5774" had to be scrapped because there was an excessive amount of carbon in the furnace during melting. The amount of carbon present during the melting process was so high that it could not be reduced down to the target amount for the particular quality of steel. In addition to the metal having to be scrapped, there were forty-four minutes of "downtime" while attempts were made to lower the carbon levels. Ultimately, both Birmingham Steel and its employees lost money as a result of the problems with heat 5774. According to Jim Horsburgh, the scrapping of a heat of steel is a "catastrophic failure" which had never occurred prior to March 30, 1998.

Heat number 5774 had four buckets. The first two buckets of the heat contained a majority of the weight and contained high levels of carbon. The third and fourth buckets constituted a little more than one quarter of the total weight of the heat, and according to Dennis Clay, a melting supervisor for Birmingham Steel, contained very small levels of carbon, if any. Clay informed Ken Hicks and John Van Giessen that heat number 5774 had to be scrapped and that Plaintiff was the first charge operator. Subsequently, Hicks asked the Plaintiff about the high carbon levels in the heat. Plaintiff told Hicks that he had built the charge out of the railroad car so that he could get the car empty before he went home. Hicks called Dominick Quigley and told him of the problem.

2

Subsequently, Ken Hicks met with Quigley and informed him that John Van Giessen did not want Plaintiff building charge buckets anymore. While Plaintiff alleges that SRA was instructed to terminate the Plaintiff, Hicks testified that he told Quigley that Plaintiff could remain on Birmingham Steel's premise and work on a forklift, a front-end loader, or any other job SRA had. Nevertheless, Plaintiff was subsequently informed by Dominick Quigley that he had been fired. Jim Horsburgh testified that he made the decision to discharge the Plaintiff based upon his performance problems and not because he was compelled to do so by Birmingham Steel.

On March 31, 1998, Plaintiff filed an EEOC charge alleging race discrimination with respect to his termination. Subsequently, on August 28, 1998, Plaintiff filed a complaint against SRA Mills[2] and Birmingham Steel alleging that his termination was a result of racial discrimination in violation of Title VII and that he was subjected to a racially hostile work environment. On January 14, 1999, Plaintiff amended his complaint to include claims under 42 U.S.C. § 1981. On August 20, 1999, Defendant filed the Motion for Summary Judgment which is the subject of this opinion.

## II. Claims

While acknowledging that SRA Mills, Inc. and Birmingham Steel Corporation are separate legal entities, Plaintiff's complaint alleges that the two were "joint employers" for purposes of Title VII and that he was therefore an employee of both entities at all times relevant to the facts of this case. Using this theory, Plaintiff seeks to recover from Birmingham Steel based upon the request or instruction made to SRA that Plaintiff not be allowed to continue as a crane operator and/or Birmingham Steel's alleged instruction that SRA terminate the Plaintiff. As such, the parties to this action devote a great deal of their efforts in the briefing of this case to addressing this joint employment issue. In addressing the issue, focus has been placed on two different lines of cases: cases using the "joint employer" concept to meet Title VII's jurisdictional requirements and cases which have followed the common law approach for determining employee/independent contractor status. *See, e.g., Virgo v. Riviera Beach Associates*, 30 F.3d 1350 (11th Cir. 1994); *Cobb v. Sun Papers*, 673 F.2d 337 (11th Cir. 1982). The predominant trend in deciding whether two entities should be treated as a joint employer is to apply the standards promulgated by the National Labor Relations Board. *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987). Following these standards, the basis of a joint employer finding is that one employer, while contracting in good faith with an otherwise independent company, "has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Virgo*, 30 F.3d at 360. On the other hand, determinations regarding employee/independent contractor status are generally made by analyzing the economic realities of the relationship viewed in light of common law agency principles and the right of the employer to control the employee. *See Cobb*, 673 F.2d at 341.

Notwithstanding the two aforementioned lines of cases, for purposes of Defendant's Motion

---

[2]Plaintiff has reached a settlement with SRA Mills, who has been dismissed as a party defendant to this action.

3

for Summary Judgment, this Court is willing to assume, as Plaintiff alleges, that both Birmingham Steel and SRA were Plaintiff's employers in this case. This assumption is at least partially based upon the fact that Plaintiff does not need to establish that Birmingham Steel was his employer in order to subject it to Title VII or § 1981 liability. The language of Title VII makes it clear that Congress intended that the rights and obligations it created under the statute would extend beyond the immediate employer-employee relationship. *See Zaklama v. Mt. Sinai Medical Center*, 842 F.2d 291 (11th Cir. 1988). Specifically, Title VII makes it unlawful for an employer to:

> fail or refuse to hire or to discharge *any individual* or otherwise to discriminate against *any individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1)(emphasis added).

Section 1981 is equally broad. Nothing in the language of either statute suggests that their application should be limited to situations involving a direct employer-employee relationship. As such, the Eleventh Circuit has, on more than one occasion, recognized that the protection afforded by these statutes extends to a claim that a defendant has interfered with an individual's employment relationship with a third party. *See Pardazi v. Cullman Medical Center*, 838 F.2d 1155, 1156 (11th Cir. 1988); *Zaklama*, 842 F.2d at 294-95. Specifically, the Eleventh Circuit has held that a defendant can be held liable for making a discriminatory decision which denies an individual access to a job or position with another independent employer. The evidence which has been submitted in this case suggests that it was Birmingham Steel's decision to disallow the Plaintiff from working as a crane operator on its facility that led to the Plaintiff's dismissal. As such, regardless of whether Plaintiff was an employee of Birmingham Steel, he would be entitled to recover under Section 1981 or Title VII if he could show that Birmingham Steel's decision was discriminatory or that its racially hostile work environment interfered with the terms and conditions of his employment with SRA.

A. Plaintiff's Termination Claims

Absent direct evidence, in order to establish a prima facie case of racial discrimination in a termination case, a plaintiff such as Lamar McCoy must show the following: (1) that he was a member of a protected class; (2) that he was qualified for the job; (3) that he was terminated despite his qualifications; and (4) after his termination, he was replaced by a person outside of the protected class, or that he was terminated while similarly situated white employees who committed similar offenses were retained. *Weaver v. CASA Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir. 1991). Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to produce legitimate, non-discriminatory reasons for the adverse employment action. *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1375 (1996). The burden then shifts back to the plaintiff, who must then establish that the employer's articulated reasons were pretextual in order to survive summary judgment. *Id.*

Despite Defendant's contention that Plaintiff has not established a prima facie case because he has failed to present evidence that he was replaced by a white person or treated differently from

4

similarly situated white employees, for summary judgment purposes, this Court will assume that Plaintiff has successfully carried this initial burden. Nevertheless, it is still apparent that Plaintiff cannot survive summary judgment because he has not offered sufficient evidence that Birmingham Steel's legitimate, non-discriminatory reason for requesting that Plaintiff not be allowed to continue working as a crane operator (or its reason for asking that he be terminated) was pretextual. Birmingham Steel has stated that Plaintiff's problem with high carbon in the charge buckets which he built, specifically with respect to heat number 5774, was the reason for Birmingham Steel's request to SRA management. Based upon the evidence that has been submitted in this case, it cannot be said that this stated reason was pretextual.

As evidence that Defendant's legitimate, non-discriminatory reason was pretextual, Plaintiff suggests that two other crane operators, Robert Bush and Sam Campbell, were also responsible for heat number 5774, and neither was disciplined or terminated. Plaintiff also asserts that there is evidence that he followed the scrap mixture and that it was the third charge crane operator who was actually responsible for the high carbon levels in the heat. However, Plaintiff offers no real evidence that the third charge operator was the culprit in this case. To survive summary judgment, the plaintiff must "present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext." *Earley v. Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). Furthermore, the evidence submitted must be more than "mere conclusory allegations and assertions." *Id.* The only evidence that Plaintiff has offered to suggest that he was not responsible for the high carbon levels is his testimony that he did not do it and the testimony of Robert Bush that there was not any scrap on the first charge side that could have caused a carbon level as high as it rose with heat 5774.

Even if Plaintiff could show that someone else was responsible for the high carbon levels in heat 5774, Defendant is still entitled to summary judgment because Plaintiff has not shown that Birmingham Steel lacked a good faith belief that Plaintiff was responsible for the heat having to be scrapped. An employment decision based upon erroneous or mistaken facts does not constitute discrimination under Title VII or Section 1981. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984). In the present case, it was logical for Defendant to believe that Plaintiff was responsible for the high carbon levels. According to a number of SRA and Birmingham Steel employees, Plaintiff had exhibited a number of problems with following the scrap mix or recipe in the past, resulting in high levels of carbon being present in the furnace. While it may be true that other white employees have also had problems with high carbon levels, Plaintiff's problems with high carbon were documented as being the worst among the crane operators. Furthermore, the first charge operator builds the first and second buckets, which generally contain a large variety of different scrap metal, including metals high in carbon. Additional buckets, however, generally contain merely filler weight metals that are not generally high in carbon. Therefore, excessive carbon levels are the result of the first crane operator not following the scrap mix a vast majority of the time. Dennis Clay testified that he informed both Ken Hicks and John Van Giessen that Plaintiff was the first charge operator on heat 5774. Taking the facts most favorable to Plaintiff, he at least built the entire first bucket. According to the furnace report, the first and second charge buckets composed a large majority of the weight in heat number 5774 and

5

were built out of metals containing high carbon levels.

The fact that Plaintiff claims that Robert Bush helped him build the first two buckets and was not terminated is not sufficient evidence of pretext because even if Ken Hicks knew that Bush had built the second bucket, he still had good reason to think that the Plaintiff had caused the high carbon levels. Plaintiff essentially admitted to Ken Hicks that he did not follow the scrap recipe when he told him that he built the first charge out of scrap from a railroad car so that he could get the car empty before his shift was over. Upon inspection of the railroad car, Hicks found that it was full of brake drums and drive shafts, which are made up entirely of high carbon steel. While Bush testified that he and Ken Hicks walked over to the third charge side after the heat was scrapped and found some cast iron, this is also insufficient evidence of pretext. Even taking Bush's testimony as truth, it is not evidence that cast iron scraps made up the third charge or that the third charge was what caused the high carbon levels in heat 5774. In fact, the furnace report suggests otherwise.

In short, Plaintiff has offered insufficient evidence that Birmingham Steel's stated reason for asking that Plaintiff not be allowed to continue as a crane operator was pretextual. The evidence that has been presented suggests that Birmingham Steel employees, at the very least, had a good faith belief that Plaintiff was responsible for the high carbon levels which caused heat 5774 to have to be scrapped. Even taking Plaintiff's allegations that John Van Giessen instructed Dominick Quigley to terminate plaintiff's employment as true, Birmingham Steel would still not be subject to Title VII or Section 1981 liability because it had a legitimate reason to terminate Plaintiff's employment which was completely independent of race. Because Plaintiff has failed to meet his burden in showing this reason to be pretextual, summary judgment is appropriate on his termination claim.

B. Plaintiff's Hostile Environment Claim[3]

To succeed on his hostile environment claim, Plaintiff must be able to demonstrate that the actions of the Defendant altered the condition of the workplace, creating an objectively abusive and hostile atmosphere. *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995). Plaintiff's hostile environment allegations are based upon the use of a few racial slurs and symbols by his co-workers. Specifically, Plaintiff alleges that the term "nigger-rig" was used by Birmingham Steel employees on at least two occasions; one of Plaintiff's co-workers referred to a black person in a magazine as "a full-blooded blue-gum"; and the term "nigger" was occasionally used by other employees. Robert Bush also testified that Ken Hicks sometimes used the term "nigger" jokingly when the Plaintiff and others picked at him about having sex with a black woman. Furthermore, Plaintiff alleges that confederate flags were worn on clothing and displayed on vehicles of various Birmingham Steel employees.

---

[3] Defendant argues that Plaintiff's racial hostile environment claim is due to be dismissed because it is outside the scope of his EEOC charge, which only addressed his termination. Because Birmingham Steel is entitled to summary judgment on this claim based upon the merits, this opinion does not address Defendant's argument.

6

In deciding whether a hostile environment was created, factors to consider include the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work. *Id.* at 1521-22. More specifically, to form the basis of a hostile environment claim, "racial slurs allegedly spoken by co-workers [must be] so 'commonplace, overt and denigrating that they create[] an atmosphere charged with racial hostility.'" *Id.* at 1521. In the present case, summary judgment is appropriate because the incidents about which Plaintiff complains do not satisfy this burden. Furthermore, while testimony has been given that Ken Hicks did use the word "nigger" on occasion, the term was either used when Plaintiff was not around or when Plaintiff was joking with him about having sex with black women. Such instances were not so commonplace and denigrating that they created a hostile environment.

Even if Plaintiff could present sufficient evidence of a hostile environment in this case, Defendant is still entitled to summary judgment because Birmingham Steel is not vicariously liable for the alleged racial slurs and actions by Plaintiff's co-employees due to the fact that Plaintiff has not presented sufficient evidence that Birmingham Steel knew or should have known of any alleged hostile environment created by its employees. "In order to hold an employer responsible under Title VII for a hostile environment created by a supervisor or co-worker, a plaintiff must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997). Birmingham Steel has a policy against discrimination which is disseminated in its employee handbook. Despite this policy, Plaintiff never made any complaints to Birmingham Steel regarding alleged racial slurs or confederate flags on the premises. Plaintiff contends that the fact that some racial slurs were occasionally made over Birmingham Steel's radio gave Defendant notice of the hostile environment. However, while many Birmingham Steel employees and supervisors may have had access to these radios, there is no indication that any management or decision-makers actually heard or were made aware of these alleged racial comments. Furthermore, the fact that Ken Hicks, a supervisor at Birmingham Steel, may have participated in alleged racial dialogue is also insufficient to establish a hostile environment claim against Birmingham Steel or to impute notice of the hostile environment to Birmingham Steel management. *See id.* As such, Defendant is entitled to summary judgment on Plaintiff's hostile environment claim.

### III. Conclusion

For the above reasons, Defendant Birmingham Steel's Motion for Summary Judgment is due to be granted.

Dated: _____Dec. 7_____, 1999

_____
Judge Sam C. Pointer, Jr.

7

Service List:

    John D. Saxon
    Tammy C. Woolley
    Bruce H. Henderson
    Bert M. Guy
    Douglas B. Kauffman
    John J. Coleman, III